CLERK'S OFFICE U.S. DISTRICT COURT
AT ROANOKE VA. - FILED

MAR 2 6 2008

JOHN F. CORCORAN, CLERK
BY: _____, DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

TAVERIS L. DOWNING,            )
      **Plaintiff,**            )    Civil Action No. 7:07-cv-00466
                    )
**v.**            )    <u>**MEMORANDUM OPINION**</u>
                    )
UNITED STATES OF AMERICA,            )    **By:  Hon. Glen E. Conrad**
      **Defendant.**            )    **United States District Judge**

Plaintiff Taveris L. Downing, Federal Register Number 31050-004, has filed a complaint pursuant to the Federal Torts Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680, with jurisdiction vested pursuant to 28 U.S.C. §1331.[1] Plaintiff alleges that personnel at United States Penitentiary, Lee County ("USP Lee")[2] in Jonesville, Virginia, negligently failed to treat a condition that turned out to have been a testicular torsion, and which ultimately resulted in the removal of plaintiff's right testicle.  As damages, plaintiff seeks, <u>inter alia</u>, "Monetary Compensation [in the amount of] [$]50,000.00."[3]  Defendant has submitted a motion to dismiss, which is now ripe for the court's consideration.  For the reasons that follow, the court will deny the motion to dismiss, and will direct defendant to submit any dispositive motions, including a motion for summary judgment supported

---

[1] Plaintiff paid the $350.00 filing fee in full; he did not apply to proceed <u>in forma pauperis</u>.

[2] Although the allegations at issue in the instant complaint occurred at USP Lee, plaintiff was an inmate at Federal Correctional Institute Memphis, in Memphis, Tennessee, when he filed the complaint.  Plaintiff indicates is presently housed at the United States Penitentiary in Atwater, California.

[3] The FTCA permits a claimant to seek monetary damages, and only money damages. 28 U.S.C. § 1346(b)(1).  Thus, the FTCA is not the proper vehicle for a declaratory action or any other injunctive relief.  Furthermore, punitive damages are not permitted under the FTCA. 28 U.S.C. § 2674.  For the purposes of the FTCA, the meaning of punitive damages is a federal question.  <u>Molzof v. United States</u>, 502 U.S. 301, 305-08 (1992) (punitive damages are those that, under common law, are intended to punish the defendant, <u>i.e.</u>, damages based on the degree of a defendant's culpability; the statutory proscription against punitive damages does not apply to damages that are not intended to punish yet may be punitive in effect; unless a class of damages was designed to punish a defendant, a plaintiff may recover such damages that might otherwise exceed ordinary pecuniary loss where a private person would be liable for such damages).

by affidavit or other evidence, within twenty (20) days from the date of entry of the order accompanying this memorandum opinion. Additionally, as explained herein, the court will grant defendant's "Request to Order In Camera Production of Document," and plaintiff will be directed to produce the requested document within ten (10) days of the date of entry of the order accompanying this memorandum opinion.

## I. Factual and Procedural Summary[4]

Plaintiff states that, after getting out of bed to relieve himself at about 5:30 a.m. on December 24, 2005, he injured his left testicle when he "attempted to get back on the top bunk [and struck] the side railing." He states that Reginald Falice, his cell-mate, who had been awakened by plaintiff's "roll[ing] around in the [top] bunk screaming and howling in agony," pressed the emergency button in their cell, but that more than 30 minutes elapsed before Officer J. Fraley arrived. By this time, plaintiff had sought Falice's assistance in getting out of the top bunk "[s]o that he could lay on the cold floor, in order to take his mind off of the pain that he was feeling." Officer Fraley inquired as to what had happened and then informed plaintiff that the nurse would check on him during her normal rounds.

Plaintiff alleges that Nurse Duncan, when she "came around to do her normal rounds," "did not even bother to check [plaintiff] out," but that "she just gave Falice two generic pills and told him to administer the medicine to [plaintiff]." She also told Falice "to press the emergency button again" "if the pain does not subside in about two hours." Plaintiff states that, about 30 minutes after taking

---

[4] The facts have been adduced from plaintiff's pleadings and the documents he submitted in support thereof. Defendant's motion to dismiss, which purports to reserve "the right to raise all other available defenses should [the instant] motion be denied," does not controvert plaintiff's factual contentions. The court will discuss additional facts as necessary in its analysis.

2

the medicine, the pain "seemed to have simmered down," but that "about [one-and-a-half] hours later, he "was back on fire again." The pain, according to plaintiff, "was so intense[] that he screamed, cried, moaned and even tried to pour cold water down in his groin area to try and stop the pain that he was feeling." He asserts that, when Falice again pressed the emergency button, half an hour elapsed before Officer Fraley responded, stating, "The Nurse says there is nothing wrong with you, so stop pressing the emergency button." Plaintiff remained "on the cold floor moaning and crying[,] hoping the pain would go away. Finally he passed out for several hours."

He states that, when he awoke at about 10:30 a.m., "[t]he pain was not that bad anymore" but that his "testicles had swollen to the size of two huge soft balls." Panicked, believing his testicles were "going to explode," he started screaming, "[N]o, no, no!" Falice "immediately pressed the emergency button again," but another 30 minutes elapsed for Officer Fraley appeared, stating, "Your [sic] not a doctor and I am not a doctor, so lay off that dam [sic] button or I am going to write both of you a shot!" Plaintiff states that Falice told Officer Fraley, "you need to go get a doctor before this man die [sic], and if he does die it will be all your fault," to which Officer Fraley responded that plaintiff "will be fine," and then left.

According to plaintiff, when Officer Fraley returned around noon "to feed the tier again," Falice "begged Fraley to get [plaintiff] some medical assistance," but Officer Fraley stated that plaintiff would "see the nurse when she makes her rounds again." Falice stated "that will be another six to eight hours from now" and that plaintiff would "probably be in critical condition by then." Officer Fraley maintained that plaintiff could see the nurse when she next made her "normal rounds."

After the 3:30 p.m. shift change, Falice again pressed the emergency button. Plaintiff states that he is unable to identify the officer, but that the officer stated that he would call the nurse right

3

away. At about 8:00 p.m., Nurse Mcintyer [sic] "came to the door" and, after inquiring about plaintiff's condition, stated that "she was going to call the doctor," gave plaintiff some pills to take, and told him to "place a cold towel around your testicles to relieve some of the pain." At around 8:30 p.m., the nurse returned and informed plaintiff that a doctor would see him the following day. Plaintiff states that he kept "a cold towel around his testicles all night and he took as many deep breathes [sic] as he could, but the pain was still intense."

The following morning, December 25, 2005, at around 5:30 a.m., Nurse Duncan made her normal rounds. Plaintiff states that he "tried to show her that his testicles was [sic] still progressively getting bigger and bigger," but that the nurse said, "[L]et the doctor worry about that, he will see you today." According to plaintiff, the nurse "then slid some pills through the door," and plaintiff "slid her a note through the door to give to the doctor."[5] By 11:00 a.m., "the doctor still had not showed up yet," and plaintiff again "pressed the emergency button to see what time the doctor was suppose [sic] to come." Plaintiff states that, "about thirty minutes later," Officer Shoemaker "came to the door and surprisely [sic] stated, [']We already know your problem and your [sic] not going to get any medical treatment until we decide to get you some medical treatment.[']"

As "[t]ime continued to pass and staff members was [sic] aware," plaintiff "was suffering and in excruciating pain," yet "[s]taff members made jokes and laughed at [plaintiff] when he

---

[5] Plaintiff has provided a copy of this note as "Exhibit A," which lists his name, Federal Register Number, and room number, and states, verbatim:

I NEED TO SEE THE DOCTOR IMMEDIATELY!!!

MY RIGHT Testicle is still swollen. I have been taking the medicine and applying cold towel against The Swelling And nothing has change. SINCE 12/24/05 I have Been having this problem!!!

The note is written in large script, and occupies the entirety of an 8.5" by 11" sheet of paper.

4

requested medical assistance." Plaintiff asserts that Officer Shoemaker advised him, "Lay down and lick your nuts." According to plaintiff, he felt that his testicles were going to "just explode," that the pain was "so intense" that he suffered "dizzy spells, [and] blackouts, and he would wake up cold and shivering." He adds that he suffered stomach cramps, vomiting, and that "he was just barely able to maintain consciousness." He states that "[t]he pain would get so bad at times, sharp pains would hit [him] in the groin area so hard[] that he would howl and scream in agony for about 30 minutes til [sic] an Hour [sic]." According to plaintiff, Falice repeatedly pressed the emergency button, but "[s]taff members would not come anymore. . . ."

Plaintiff asserts that, "on the third day," December 27, 2005, Officer Fraley told him, "['T]ell your friend [Falice] over there to stop filing them fucking liens and quit fucking with our property and maybe you will get some dam [sic] medical treatment."[6] He maintains that "[t]he Saga [sic]

_____

[6] Plaintiff's cell-mate was Reginald Anthony Falice, one of two co-defendants in United States v. Martin, 356 F. Supp.2d 621 (W.D. Va. February 17, 2005). In one instance, Falice filed Uniform Commercial Code ("UCC") financing statements with the Virginia State Corporation Commission ("SCC") identifying himself as a "secured party" for a debt of $8,000,000.00 against various judges and court officials. In a second instance, Falice caused financing statements to be filed with the Virginia SCC in which he named himself as the secured party for a debt of $100,000,000.00 allegedly owed to him by persons employed or formerly employed by the BOP at USP Lee. The court (Williams, S.J.) found that the commercial liens filed with the SCC were null and void, that the imposition of a permanent injunction against defendants was warranted, and that the United States could recover costs and fees from defendants, with the exception of attorneys' fees, which were not recoverable. The United States filed the case on December 31, 2003. It was decided – and the injunction was thus imposed against defendants – on February 17, 2005, and the events out of which the instant complaint arises began on December 24, 2005.
Plaintiff asserts that, after Officer Fraley made the aforementioned comment regarding Falice's liens, plaintiff

> begin [sic] to cry because he knew, [sic] he was not going to get any medical treatment which meant in his mind, [sic] that he might die from some type of bloodcald [sic] or internal bleeding. [Plaintiff] knew Falice was not going to stop fling [sic] liens on the staff members nor was Falice going to lift anyone [sic] of the liens he already had filed against the staff members.

5

continued until December 28th [at] 10:30 Am. [sic]," [7] when "[o]ne of the Head Administrators made his rounds," whereupon "Falice started banging and kicking on the door. . . ." According to plaintiff, he presented himself to the unidentified Head Administrator "with his testicles cuff [sic] in his hands," and the Head Administrator "immediately send [sic] for the officers to take [plaintiff] to the doctor's office." The doctor, upon seeing plaintiff, "immediately had [plaintiff] rushed to the Pennington Hospital." Plaintiff states that he was forced "to hobble a quarter of a mile . . . to the transportation van" and that "[e]ach hobble . . . felt like he was being set on fire alive and the sharp pains that he received in his groin almost made him faint." Subsequently, at the Lee Regional Medical Center ("Lee Regional") in Pennington Gap, Virginia, plaintiff was treated with surgery for the removal of his right testicle; additionally, the surgeon's Report, titled "Operative Procedure," indicates that the surgery also explored the possibility that plaintiff's left testicle would be removed, but that the left testicle was preserved. The surgery was successful, and plaintiff was returned to USP Lee. [8]

---

[7] Plaintiff's submissions included a note, dated December 28, 2005, from David K. Allred, DO, who is identified as the Clinical Director at USP Lee. The note, bearing plaintiff's name, Federal Register Number, and cell number, states: "Sir; [sic] You have been added to the sick call list. I will see you as soon as possible."

[8] Plaintiff adds:

After the surgery and removable [sic] of [plaintiff's] right testicle, the staff members really took their torture to the extreme. The [lieutenant] bluntly lied to the doctor. The [lieutenant] told the doctor that there was a medical facility at the institution, where [plaintiff] could rest and heal-up. The Doctor release [sic] [plaintiff] back into their care on those grounds.
    Well [plaintiff] was in for a real surprise once they got him back into their care, they finished there [sic] torture. Once they got [plaintiff] back to the institution, they wheel chaired [sic] him around to the psychiatric ward. When [plaintiff] seen [sic] what was going on he begin to cry and scream no, no no!! Somebody help me please!! AH, AH, AH. Officer Jackson open the ward door and Jackson and Nurse Duncan pulled [plaintiff] out of the wheel chair [sic] and force [sic] him down on to a plastic mat that was pre-laid on the floor, then the nurse pulled down [plaintiff's] pants from the rear and gave him a shot in the buttocks, everything immediately went black. [Plaintiff] was later awaking [sic] several hours later from loud thunderous banging on
(continued...)

6

The Operative Procedure Report (also "the Report") is a five page document prepared by a Dr. Hossein Faiz, the surgeon at Lee Regional who treated and operated on plaintiff. The Report states the following "PREOPERATIVE DIAGNOSIS": "Severe right testicular edema, progressive increasing pain, abnormal ultrasound of right testicle with lack of blood flow into the right testicle consistent with acute torsion of right testis associated with inflammatory changes in the epididymis and peritesticular area, suspected testicular infarction."

The "POSTOPERATIVE DIAGNOSIS," which follows, is given as "[r]ight testicular infarction secondary to 360 torsion of testicular pedicle." Under "NAME OF PROCEDURE," the Report specifies the following: "1. Exploration of the right scrotum, right orchiectomy for infarcted testicle. 2. Left orchiopexy." The following is stated under the heading "INDICATION," which the court quotes verbatim, in pertinent part:

> 28 year old gentleman, a resident of Lee Federal Penitentiary was brought to the ER with a history of hitting his right testicle and right scrotum against a metal bar 4 days ago when jumping up and down for 5 feet height. Initially, he felt pain in the right testicle but the pain stabilized. However, progressively after 48 hours, the pain became more severe associated with progressive increase in edema. He was seen in the ER. The ER physician evaluated the patient, obtained a ultrasound of the testicles. I reviewed this ultrasound with the radiologist which indicated lack of any blood flow into the right testicle indicating presence of acute torsion of right testicle.
>
> With a history of onset of symptoms 4 to 5 days ago, in case of torsion of testicle, it was expected that the patient would have already developed testicular infarction secondary to torsion and since it is 4 to 5 days old he should have been toxic, more severe pain (he described his pain severity scale of 8/10). Urgent exploration of right scrotum was indicated. The patient was advised that there is a high possibility that he would require orchiectomy for testicular infarction but if

---

[8](...continued)
the door. As he began to come through he heard someone screaming nigger get your ass up we are not done with you yet! Everything was moving around and [plaintiff] barely moved, he then passed out again. He does not remember to this day whatelse [sic] happen [sic]. However; [sic] [plaintiff] does believe he was sexually assaulted during the time he was unconscious.

7

testicle was viable, we will perform right orchiopexy and biopsy of right testicle and then perform also left orchiopexy to prevent future left testicular torsion. However, postoperative wound infection, hemorrhage, epididymoorchitis, persistent pain, atrophy of testicle and also even if we left the testicle in place there would be a chance that the patient would develop atrophy of testicle and require orchiectomy in the future. Complications of general anesthesia were all discussed as well.

The Report includes a "PHYSICAL EXAM," which the court quotes verbatim, in relevant part:

Surprisingly, the patient did not appear to be in extremely severe distress. As described by the patient, the pain severity scale of only 8/10 scale. The patient was resting comfortably on the examining table, but at the time of examination of scrotum he had excruciating pain in palpation. . . . The left testicle was present in the scrotum, normal, intact. Right scrotum was severely edematous, excruciatingly painful. The testicle appeared to be located higher than normal location in the scrotum, compatible with torsion of the testicular pedicle. . . .

With a diagnosis of suspected acute torsion of right testicle and the patient understanding about the diagnosis and nature of exploration of the scrotum and bilateral orchiopexy if the testicle is viable, otherwise right orchiectomy and left orchiopexy were described to the patient. The details, possible complications of procedure were discussed. The patient understood this very well and signed a consent form.

The "PROCEDURE" section of the Report states, in pertinent part (verbatim quote):

The patient was taken to the OR where under general endotracheal anesthesia genitalia and lower abdomen were prepped and draped in the sterile technique. An incision was made in the right scrotum along of the . . . [illegible] . . . incision was deepened through the subcutaneous tissue. Extensive edema of the subcutaneous tissue, cremasteric fibers and tunica vaginalis were present after these structures were incised. The testicle was identified. There was pinkish blood tinged fluid present in the scrotal sac. The right testicle was delivered into the operative field and examination revealed that completely infarcted, there was 360 degree rotation and twist of the testicular pedicle. Incision in the testicular capsule revealed that the parenchyma of the testicle was completely hemorrhagic infarcted. It was obvious that the testicle could not be salvaged and has to be resected. The base of the testicular pedicle was double clamped, transected between clamps. The transected testicle was submitted to the Pathology Department. The stump was suture ligated by 2.0 Vicryl suture. The operative field was copiously irrigated with saline solution. A 15 French Jackson-Pratt drain was placed in the scrotal sac and brought out

8

through a small stab wound distal to the scrotal incision. The tunica layer and cremasteric fascia were approximated by interrupted 3-0 Vicryl suture. Subcutaneous tissue by interrupted 5-0 Vicryl suture and the skin by staples. The JP drain was anchored to skin by 3-0 silk suture.

Attention was made at this time towards the left scrotum and left testicle. An incision was made in the left scrotal skin along the direction of the skin crease, deepened through the subcutaneous tissue and the cremasteric fascia was incised. The scrotal sac was entered. The left testicle was completely normal. There was a small amount of yellowish fluid present in the left scrotum which was aspirated. 3-0 chromic catgut suture was placed in the most dependent portion of the left testicle. An incision was made in the cremasteric fascia which was dissected from the underlying skin of the scrotum and by pulling the suture ligature, which has been placed on the testicle, the left testicle was delivered through . . . [illegible] . . . cremasteric fascia and placed in the subcutaneous space. The suture ligature was tied to the subcutaneous tissue transfixing the left testicle in the subcutaneous space. The cremasteric fascia was then approximated by interrupted 3-0 Dexon, subcutaneous tissue by 5-0 Dexon, skin by skin staples. A sterile dressing was applied.

The patient tolerated the procedure very well and was transferred to the Recovery Room in satisfactory condition.

Plaintiff has submitted also a Surgical Pathology Report ("Path Report"), dated December 30, 2005, from Highlands Pathology Consultants, P.C., in Kingsport, Tennessee. The Path Report indicates a clinical diagnosis of "Right testicle torsion," and the following "DIAGNOSIS" of the specimen:

> Testis and epididymis, right, orchiectomy:
>     Hemorrhagic infarction
>     (clinically, secondary to torsion).

The Path Report includes also the following "GROSS DESCRIPTION":

> Received in formalin and identified as "infarcted R testis" is a single dark purple-blue testis with epididymis. The dimensions of the testis are 5.3 x 3.0 x 3.0 cm. The epididymis has dimensions of 5.5 x 1.5 x 0.9 cm. The cut surface of the testis is a dark burgundy-red on the inside and dark black red near the periphery of the testis close to the tunica. The cut surfaces of the epididymis are similar in appearance. . . .

Plaintiff submitted the requisite Standard Form 95 ("SF 95"), "Claim for Damage, Injury, or

9

Death," which appears (the handwritten portions of the SF 95 being somewhat illegible) to have been signed and dated October 24, 2006, and was received by the BOP on November 7, 2006. The SF 95 states that the incident occurred on December 24, 2005, that Reginald Falice witnessed the events, and in the "Basis of Claim" section refers the recipient to "See Attach."[9] The SF 95 states "2,250,000.00" in the "Amount of Claim" section.

Plaintiff received a reply, dated May 27, 2007, from the Bureau of Prisons regarding his SF 95.[10] The reply stated, in pertinent part:

> Your claim has been considered for administrative settlement under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., and authority granted under 28 C.F.R. § 0.172. You claim government liability in the amount of $2,250,00.00 [sic] for an injury that occurred on December 24, 2005. Specifically, you allege that while attempting to get back into your top bunk, you landed on the side railing, injuring your inner thigh and testicle. You allege staff at USP Lee County denied you medical treatment in retaliation.
>
> Investigation into your claim reveals that on December 28, 2005, you were seen during sick call SHU rounds by the Clinical Director. You reported slow progressing scrotal pain and swelling since approximately December 24, 2005, and that you were vomiting. When examined by the Nurse earlier, you only reported testicle pain,

---

[9] The complaint, reviewed in the preceding paragraphs, is a duplicate of the attachment. Both the attachment and the complaint bear the BOP's date stamp of November 7, 2006.

[10] To proceed in the district court with a claim under the FTCA, a claimant must first exhaust the available administrative procedures. 28 U.S.C. § 2675. The exhaustion requirement is jurisdictional and may not be waived. Plyler v. United States, 900 F.2d 41, 42 (4th Cir. 1990). Plaintiff demonstrates his exhaustion of the applicable administrative remedies by providing a copy of the requisite SF 95 and a letter, dated March 27, 2007, to him from the BOP's Beckley Consolidated Legal Center ("CLC"). Plaintiff's FTCA complaint was date-stamped as having been received by the Staff Attorney's Office in Richmond, Virginia, on August 7, 2007, and was docketed by the United States District Court for the Eastern District of Virginia on August 13, 2007. Thereafter, by order signed on September 11, 2007, but entered upon the docket of the Eastern District on September 21, 2007, the complaint was transferred to this district "[b]ecause all of the alleged events or omissions giving rise to the claim occurred" here. The case was entered upon this court's docket on September 27, 2007. Subsection (b) of 28 U.S.C. § 2401 provides that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented." The instant complaint was filed within six months after the March 27, 2007, denial of Plaintiff's SF 95.

10

denied any trauma, altercations or previous history of scrotal or inguinal surgery as the cause of your pain and swelling. You did report that your injury was possibly due to you jumping from your top bunk. An exam revealed a large swollen scrotum. You were transferred to the local emergency room for further care.

On December 29, 2005, you returned to USP Lee County, following surgery to remove your testicle due to testicular torsion. You were monitored in the observation room for about three hours and received both oral and injection pain medications and antibiotics. Approximately two hours after you were transferred back to the Special Housing Unit, you complained of nausea and vomiting. Medical staff administered medication to control your symptoms. Two hours later you received another dose of medication and approximately an hour later your vomiting subsided and you had no further complaints.

Your progress was monitored on December 31, 2005, January 1, 2006[,] and January 3, 2006. You made no complaints during this time. On January 4, 2006, you had a follow-up appointment with the surgeon and had staples removed. The surgeon's report indicated that you stated on December 28, 2005, that you had injured yourself four days earlier, that it initially caused you pain, but the pain subsided. You then indicated that after 48 hours the pain increased.

As you have been provided appropriate health care and there is no evidence an act or omission of a government employee is a factor in your injury, your claim is denied. This is a final denial of your claim. If you are not satisfied with this determination, you have six months from the date of this letter to bring suit in an appropriate United States District Court, should you wish to do so.

The suit was timely filed[11], plaintiff paid the requisite filing fee in full[12], defendant was

served, and defendant's response was due in early January 2008. On January 3, 2008, defendant

filed a motion seeking an extension of time of two months within which to file its response;

however, on January 4, 2008, the motion was denied because defendant had suggested no reason for

granting it a two-month enlargement of time. Thereafter, on January 4, 2008, defendant submitted

a motion for reconsideration of its request for an enlargement of time, seeking a much shorter

---

[11] See supra, n. 10.

[12] See supra, n. 1.

extension, to February 19, 2008, stating that the extension was warranted because defendant was "currently seeking authority to enter into settlement negotiations with Plaintiff" and that plaintiff had consented "to an extension of 45 days." The extension was granted. On February 15, 2008, defendant submitted the instant motion to dismiss. On February 19, 2008, plaintiff was notified of defendant's motion as required by <u>Roseboro v. Garrison</u>, 528 F.2d 309, 310 (4th Cir.1975), and warned that judgment might be granted for the defendants if he did not respond in an appropriate fashion. Plaintiff has timely responded.

## II. THE FTCA AND NEGLIGENCE

The United States is entitled to sovereign immunity, and cannot be sued without its consent. <u>FDIC v. Meyer</u>, 510 U.S. 471, 475 (1994). The FTCA operates to waive the sovereign immunity of the United States such that the government may be "liable in tort in the same manner and to the same extent as a private individual under like circumstances" under the law of the state in which the conduct occurred. 28 U.S.C. § 2674; <u>Baum v. United States</u>, 986 F.2d 716, 719 (4th Cir. 1993); <u>see also</u> <u>Williams v. United States</u>, 50 F.3d 299, 305 (4th Cir. 1995) (the FTCA provides a limited waiver of sovereign immunity for torts committed by agents or employees of the United States acting within the scope of their employment). There is no individual liability under the FTCA; remedies against the United States under the FTCA are the exclusive damage action available for torts committed by government employees acting within the scope of their employment. 28 U.S.C. § 2679(b)(1); <u>Jordan v. Hudson</u>, 879 F.2d 98, 99 (4th Cir. 1989). Even when suit against the United States is barred under one of the exceptions to the FTCA, no tort remedy is available against an individual employee. <u>United States v. Smith</u>, 499 U.S. 160, 165-66 (1991).

As a waiver of immunity, the FTCA is to be "strictly construed, and all ambiguities [ ]

12

resolved in favor of the sovereign." Robb v. United States, 80 F.3d 884, 887 (4th Cir.1996). The FTCA contains a number of exceptions, including a discretionary function exception. Hawes v. United States, 409 F .3d 213, 216 (4th Cir.2005). The discretionary function exception excludes from the FTCA's waiver of sovereign immunity

> any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

If no exception applies and sovereign immunity is waived under the FTCA as to an officer's negligent acts, the United States may be held liable in monetary damages for personal injury, property loss, or death to the plaintiff, caused by the acts of a governmental employee within the scope of his employment, if those acts meet the definition of negligence under state law. 28 U.S.C. § 1346(b); Rayonier Inc. v. United States, 352 U.S. 315, 319-20 (1957); United States v. Muniz, 374 U.S. 150, 152-53. To prove negligence under Virginia law, a plaintiff must (1) identify a legal duty of the defendant to the plaintiff, (2) a breach of that duty, and (3) injury to the plaintiff (4) proximately caused by the breach. Talley v. Danek Medical Inc., 179 F.3d 154, 157 (4th Cir. 1999).[13] In actions brought under the FTCA, federal courts apply the substantive law of the state in which the act or omission giving rise to the action occurred; in the instant case, the substantive law of Virginia applies because the negligent act or omission occurred in Virginia. Myrick v. U.S., 723 F.2d 1158, 1159 (4th Cir. 1983) (citations omitted).

---

[13] The court notes that, insofar as plaintiff attempts to allege a claim of negligent supervision, such claims are nonactionable under the FTCA. See Sheridan v. United States, 969 F.2d 72, 74 (4th Cir. 1992).

13

## III. DEFENDANT'S MOTION TO DISMISS

Defendant argues that plaintiff's entire complaint should be dismissed with prejudice because of plaintiff's "failure to comply with the medical expert certification provision of the Virginia Medical Malpractice Act" ("VMMA"), Va. Code § 8.01-20.1.[14] Defendant asserts that the complaint is "based on the alleged negligent medical treatment of Plaintiff by staff" at U.S.P. Lee and that "[t]he basis of Plaintiff's Complaint is that prison staff through their negligence and medical malpractice, [sic] failed to diagnose and treat his testicular torsion."

In Virginia, a party alleging medical malpractice must obtain an expert certification of merit before serving the defendant. Va. Code § 8.01-20.1; Parker v. United States, 475 F. Supp. 2d 594, 596 (E.D. Va. 2007) (Ellis, J.). An FTCA medical malpractice action is subject to the VMMA expert certification of merit requirement.[15] Parker, 475 F. Supp. 2d at 596. The VMMA provides an exception to the certification requirement where expert certification is unnecessary "if the plaintiff, in good faith, alleges a medical malpractice action that asserts a theory of liability where expert testimony is unnecessary because the alleged act of negligence clearly lies within the range of the jury's common knowledge and experience." Va. Code § 8.01-20.1. The exception only applies in those instances when "the alleged acts of medical negligence fall within the range of a jury's or factfinder's[16] common knowledge and experience." Parker, 475 F. Supp 2d at 597 (citing

---

[14] In moving to dismiss, defendant does not cite the Federal Rules of Civil Procedure, much less any particular provision under Fed. R. Civ. P. 12(b) that would permit the dismissal.

[15] Defendant erroneously cites Starns v. United States, 923 F.2d 34, 37 (4th Cir. 1991), as standing for the proposition that an FTCA medical malpractice action is subject to the VMMA expert certification of merit requirement. Starns dealt exclusively with the VMMA's $750,000.00 damage cap, and did not in any instance refer to Va. Code § 8.01-20.1 or the expert certification of merit requirement.

[16] As this is an FTCA case, to be tried without a jury, the presiding judge is the sole finder of fact. See

(continued...)

14

<u>Beverly Enterprises-Virginia, Inc. v. Nichols</u>, 247 Va. 264, 267 (1994)). "Where... a plaintiff 'calls into question' a 'quintessential professional medical judgment,' the matter 'can be resolved only by reference to expert opinion testimony.'" <u>Parker</u>, 475 F. Supp 2d at 597 (quoting <u>Callahan v. Cho</u>, 437 F. Supp.2d 557, 563 (E.D. Va. 2006) (Ellis, J.)).[17]

Defendant's motion fails on two grounds. In the first instance, defendant short-changes the allegations in the complaint. As reflected in the preceding factual and procedural summary, plaintiff does not merely allege that he was denied medical treatment due to a medical misjudgment, but instead claims that USP Lee staff generally denied him appropriate medical care. Accordingly, the court need not construe his complaint as alleging medical malpractice, and certainly need not construe his complaint as alleging only medical malpractice. Medical malpractice cases arise out of consensual relationships between a "health care provider" and a "patient." <u>See</u> Va. Code § 8.01-581.1 (defining "Malpractice" as "any tort action or breach of contract action for personal injuries or wrongful death, based on health care or professional services rendered, or which should have been rendered, by health care provider, to a patient"); <u>Starns v. United States</u>, 923 F.2d 34, 37 (4th Cir. 1991) (Va. Code § 8.01-581.1 "defines 'health care provider' as 'a person, corporation, facility or institution licensed by this Commonwealth to provide health care or professional services'")[18]; <u>Harris v. Kreutzer</u>, 271 Va. 188, 196-97 (2006) (doctor's performance of mental and physical examination of a party to litigation, whose mental or physical condition was in controversy, was "health care"

---

[16](...continued)
28 U.S.C. § 2402.

[17] The court observes that the two federal cases defendant cites in its motion that are relevant to the issue of the VMMA's expert certification requirement – <u>Parker</u> and <u>Callahan</u> – were decided upon the government's motions for summary judgment, not motions to dismiss.

[18] <u>See</u> <u>supra</u> n. 15 regarding defendant's incorrect citation of <u>Starns</u>.

15

rendered by a "health care provider," in the person of doctor, to a "patient," the examinee, for purposes of statute defining "malpractice" as any action for personal injuries based on "health care" or professional services rendered by a "health care provider" to a "patient"; the examination was an "act" by doctor for a medical diagnosis of examinee because examinee's mental or physical condition was in controversy); Richman v. National Health Laboratories, Inc., 235 Va. 353, 357-58 (1988) (clinical laboratory, which provided erroneous test results to physician, was not "health care provider" under the Medical Malpractice Act). Although the court may eventually be persuaded that plaintiff's claims arising out of alleged acts or omissions of nurses and doctors at USP Lee invoke medical malpractice and only medical malpractice against those defendants, it is clear that plaintiff's claims arising out of alleged acts or omissions of Officer Fraley, Officer Shoemaker, and an unidentified officer allege not medical malpractice but a more garden variety of negligence invoking the familiar elements of duty, breach, causation, and harm. See Talley, 179 F.3d at 157. The FTCA makes the United States liable for the negligent acts of its employees pursuant to states law under the doctrine of respondeat superior.[19] Laird v. Nelms, 406 U.S. 797, 801 (1972); see also Abraham v. United States, 932 F.2d 900 (11th Cir. 1991); Hallberg v. Hilburn, 434 F.2d 90 (5th Cir. 1970). Accordingly, defendant must respond specifically to plaintiff's factual assertions regarding the alleged acts or omissions of each of defendant's employees.

Moreover, even assuming that plaintiff's complaint alleged only medical malpractice against health care providers, the court is not persuaded by defendant's bald assertion that plaintiff's allegations – with which defendant has not, as of yet, raised any dispute – of having presented

---

[19] However, the language of the FTCA specifically waives sovereign immunity only for negligence; the FTCA does not waive sovereign immunity under theories of strict liability or absolute liability. Laird v. Nelms, 406 U.S. 797, 799 (1972).

himself to defendant's employees with swollen and painful testicles does not fall within the exception to the certification requirement. Defendant states, unsupported by argument or citation, that "[p]laintiff's allegation that medical staff negligently failed to diagnose and treat his testicular torsion is essentially a challenge to the medical staff's professional medical judgment," that "[t]he standard of care for testicular torsion does not fall within the common knowledge or understanding of judges or lay jurors," and that, "[t]herefore, the exception does not apply in this case" and the "case should be dismissed." As the court has already observed, plaintiff's allegations do not merely allege "a challenge to the medical staff's professional medical judgment." Nor does it appear upon the record presently before this court and thoroughly recounted in the preceding factual and procedural summary that the duty imposed by plaintiff's alleged presentation with swollen and painful testicles falls outside "the common knowledge or understanding of judges. . . ." Parker, 475 F. Supp 2d at 597 (citing Beverly Enterprises-Virginia, 247 Va. at 267). Thus far, the court believes "expert testimony is unnecessary because the alleged act of negligence clearly lies within the range of the [finder of fact's] common knowledge and experience." Va. Code § 8.01-20.1. Although defendant will have the opportunity to convince the court otherwise, the court at present believes that it is common layman's knowledge that testicular pain in general – and acute testicular pain and swelling in particular – requires immediate medical attention[20], and that plaintiff's assertions suggest

---

[20] "A doctor may diagnose [testicular torsion] based on only the patient's description of the symptoms and the examination findings. . . . The twisted cord cuts off the blood supply to the testis. Thus, the only hope of saving the testis is surgery to untwist the cord within 24 hours of the onset of symptoms." See THE MERCK MANUAL OF MEDICAL INFORMATION HOME EDITION (1997) at 1062. The medical term for "testicular pain" is "orchitis." See http://en.wikipedia.org/wiki/Testicular_pain; DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, EDITION 28 (1994) at 1188. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY, ELEVENTH EDITION (1966), entry for "orchitis" states, in part, at 649:

Fever, pain and swelling of the involved testicle are evident. . . . Atrophy of the involved gonad
(continued...)

17

that defendant bore a duty to act when plaintiff presented with the alleged symptoms.[21]

---

[20](...continued)
commonly follows. **Therapy** consists of bed rest, scrotal support, application of an ice bag and treatment of the primary disease. **Torsion of the testis**. . . . [m]ay occur when the patient turns in bed or as a result of strenuous work or exercise. The testis is acutely tender and swollen and is held high in the scrotum. . . . <u>As the testis becomes gangrenous because of occluded circulation, nausea and vomiting, scrotal edema, fever and leukocytosis occur. Immediate operation is indicated to untwist the cord.</u> . . . If the testis already is gangrenous, it must be removed.

(Italicized emphasis added.)

[21] Courts in other jurisdictions have considered this issue and, in general, the cases support this court's conclusion. <u>See, e.g.</u>, <u>Garton v. Dood, et al.</u>, Civil Action No. 3:05-cv-7253, (N.D. Ohio, January 16, 2008) (although plaintiff, who at the time of injury was a minor incarcerated in a Juvenile Residential Center ("JRC"), failed to state a claim of deliberate indifference under 42 U.S.C. § 1983, his claim of negligence against the physician and physician's employer on behalf of its other employees survived summary judgment; plaintiff alleged that for two days medical staff at the JRC ignored his complaints of testicular pain, failed to timely perform an examination, failed to refer plaintiff to a physician who could perform the examination, and failed to instruct nurses to monitor plaintiff and report changes in pain, swelling, nausea, or vomiting; ultimately, plaintiff underwent partial castration after a diagnosis of testicular torsion; like Virginia, Ohio negligence law features an expert report requirement, and an exception to the requirement "where the lack of skill or care is so apparent that only common knowledge and experience are required to understand and judge it"); <u>MCG Health, Inc. v. Barton</u>, 285 Ga. App. 577 (May 25, 2007) (plaintiff underwent several botched surgeries before being diagnosed with testicular torsion; material issues of fact as to whether immediate post-examination surgery would have increased the probability of salvaging patient's testicle precluded grant of summary judgment); <u>Ware v. Zeller, et al.</u>, 214 Fed. Appx. 363 (5th Cir. November 14, 2006) (acknowledging that, although claims of deliberate indifference under 42 U.S.C. § 1983 and the Eighth Amendment must meet a much higher threshold than allegations of negligence and malpractice, fact question as to whether nurse's failure to provide any treatment when prisoner returned to infirmary with continued pain in testicle constituted deliberate indifference, thus precluding summary judgment on civil rights claim against her; patient began complaining of pain on November 20, 2999, was examined several times by the nurse, who observed his worsening symptoms, but was not permitted or referred to see a physician until a previously scheduled appointment on Monday, November 22, 1999; given the nurse's knowledge of plaintiff's condition, instructions by the doctor to call if plaintiff did not improve, her alleged statements to plaintiff that she knew that he needed treatment, and plaintiff's new and continuing complaints of pain and swelling in his testicle, plaintiff demonstrated that there were genuine issues of material fact regarding whether the nurse's failure to provide any treatment on November 21, 1999, constituted deliberate indifference, and whether her actions were objectively reasonable); <u>Bhagwant v. Kent School Corp., et al.</u>, 453 F. Supp.2d 444 (D. Conn. September 25, 2006) (boarding school student who alleged that he was not timely diagnosed with testicular torsion and, as a result, lost his testicle, brought action for medical malpractice and negligence against boarding school and against doctor and nurse, who both worked in school's infirmary; the school, doctor, and nurse moved for summary judgment; the district court held that material issues of fact as to whether nurse breached the duty of care precluded grant of summary judgment to school and nurse; plaintiff first reported with testicular pain on November 17, 2002, was diagnosed with testicular torsion on July 28, 2003, and his right testicle was removed on August 19, 2003); <u>Tesillo v. Emergency Physician Associates, Inc.</u>, 376 F. Supp.2d 327, (W.D. N.Y. July 18, 2005) (plaintiff was admitted to Emergency Room ("ER") on December 5, 2002, at approximately 11:30 p.m., complaining of acute
(continued...)

## IV. DEFENDANT'S "REQUEST TO ORDER IN CAMERA PRODUCTION OF DOCUMENT"

In response to defendant's motion to dismiss, plaintiff filed a "Notice of Certification of Merit," wherein plaintiff attested that, "at the time [he] requested service of process against [the] United States," he "had in [his] file a certification as required by" Va. Code § 8.01-20.1. Thereafter, defendant filed a "Request to Order In Camera Production of Document" so that the court may "determine whether Plaintiff in fact complied with Va. Code § 8.01-20.1 prior to requesting service be issued." Plaintiff has now submitted a "Motion to Object to the Defendant [sic] Request of a Camera [sic] Copy of the Certification of Merit," asserting that he "had in his files a Certification of Merit," that "defendant has no caselaw [sic] to support that he [sic] is entitled to know who sign [sic] the certification of merit," and that "[t]he expert medical doctor name [sic] need [sic] to remain confidential, in order to keep the defendant from threating [sic], coercion, intimidating or tempering

---

[21](...continued)

pain in lower abdomen and groin; physician diagnosed patient with gastritis and discharged him; six hours later, plaintiff returned to the ER, where another physician diagnosed testicular torsion, and plaintiff immediately underwent surgery to remove his left testicle; material issues of fact precluded summary judgment); Velazquez v. UPMC Bedford Memorial Hosp., et al., 328 F. Supp.2d 549 (W.D. Pa. July 26, 2004) (plaintiff alleged medical malpractice against hospital and physician for failing to diagnose testicular torsion, resulting in loss of testicle; plaintiff failed to file certificate of merit, required under Pennsylvania substantive law; defendants' praecipe for entry of non pros was denied); Swanson ex rel. Swanson v. Keen, et al., Civil Action No. 00-cv-3188 (N.D. Ill. June 27, 2003) (in testicular torsion case against nurse, "[t]here was no disagreement about what constitutes the standard of care. The jury was capable of determining whether that standard was met. . . ."); Danhauer v. Youth Development Center at Kearney, et al., 2001 WL 1355317 (2001) (testicular torsion case under Nebraska Tort Claims Act; reversing summary judgment in favor of defendants, appellate court found genuine issue regarding causation; plaintiff was minor committed to youth detention center by court order when he reported progressive testicular pain and swelling beginning on November 4, 1995, but detention center staff, who gave plaintiff a hot water bottle and aspirin, failed to obtain medical treatment for plaintiff until November 7, 1995, when he was diagnosed with testicular torsion and his left testicle was removed; expert witness testified "that testicular torsion is a medical emergency requiring immediate treatment and that unless the torsion is manually or surgically removed, the tissue begins to be irreversibly damaged at about 6 to 8 hours" and the loss of plaintiff's testicle "was directly and proximately caused by the failure to provide medical treatment . . . within 20 hours of the onset of pain and discomfort"; an operational memorandum existed on the subject of emergency medical service); Craft v. Wilcox, 180 Ga. App. 372 (1986) (testicular torsion patient sued doctor over alleged failure to institute necessary treatment in a timely fashion by attempting to diagnose patient's condition based on symptoms related over phone; trial court granted doctor's motion for summary judgment; appeals court held that material questions of fact existed as to whether doctor was negligent, and as to whether his negligence was proximate cause of patient's loss).

19

[sic] with the expert medical doctor."

Plaintiff's arguments are not persuasive. As the court has already explained, in Virginia, a party alleging medical malpractice must obtain an expert certification of merit before serving the defendant, and an FTCA medical malpractice action is subject to the VMMA expert certification of merit requirement. <u>Parker</u>, 475 F. Supp. 2d at 596. Because plaintiff avers that he has obtained such certification,[22] and because it is arguable that a portion of plaintiff's complaint "'calls into question' a 'quintessential professional medical judgment'" that "'can be resolved only by reference to expert opinion testimony,'" <u>Parker</u>, 475 F. Supp 2d at 597 (citation omitted), and because such plaintiff cannot proceed with such claims without having obtained the certification, plaintiff will submit the expert medical certification, or information to support the alleged existence of such medical expert opinion, to this court, <u>in camera</u>,[23] within ten (10) days of the date of entry of the order accompanying this memorandum opinion.

## V. CONCLUSION

Based on the foregoing, the court will deny defendant's motion to dismiss, and will direct defendant to submit any dispositive motions, including a motion for summary judgment supported by affidavit or other evidence, within twenty (20) days from the date of entry of the order accompanying this memorandum opinion. Additionally, the court will grant defendant's "Request to Order <u>In Camera</u> Production of Document," and plaintiff will be directed to produce the requested document within ten (10) days of the date of entry of the order accompanying this memorandum

---

[22] Plaintiff is reminded that he has sworn "under the penalty of perjury" that his representations to this court are "the truth."

[23] Documents submitted <u>in camera</u> are available for the court's private perusal and consideration, and are entered upon the docket under seal, accessible to court personnel only.

20

opinion.

The Clerk is directed to send copies of this memorandum opinion and accompanying order to plaintiff and to all counsel of record for defendant.

**ENTER**: This _25ᵗʰ_ of March, 2008.

_____
United States District Judge